SUSAN NUDELMAN, demandante y recurrida, *v.* MIGUEL A. FERRER BOLÍVAR, demandado y recurrente.

*Número:* R-77-144        *Resuelto:* 31 de mayo de 1978

*Souffront & Souffront* y *Héctor Santiago,* abogados del recurrente; *Nido, Berríos, Menéndez & Dubón* y *Dubón, González & Berríos,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A manera de prólogo consignamos nuestra esperanza de que una vez meditada la disposición final del recurso, las diferencias que subsistan entre las partes, en lugar de perturbar, fortalezcan el vínculo común que como progenitores les une, aun después de roto el matrimonio, a saber, el exclusivo bienestar de sus hijos. Se impone un resumen del trasfondo

fáctico—que más que jurídico, es humano—según lo eviden-
cia la prueba y demás constancias en autos.

Susan Nudelman contrajo matrimonio con Miguel A.
Ferrer Bolívar el 4 de agosto de 1962. Procrearon dos hijos
nombrados Ileana y Miguel Antonio (Mickey), de 14 y 9
años de edad respectivamente, ambos nacidos en San Juan,
Puerto Rico, donde ininterrumpidamente residieron durante
la vigencia del matrimonio. Ferrer posee un bachillerato y
maestría en administración comercial y a través de varios
años se ha desempeñado exitosamente y bien remunerado
como primer vicepresidente de una corporación dedicada al
corretaje de valores. En tal capacidad es responsable de las
operaciones de la empresa en Puerto Rico y Sur América.
Por su parte la madre ostenta un bachillerato en artes, es
pintora y escultora, y, además, recientemente se le confirió el
grado de maestría en sicología de la Universidad de Puerto
Rico. No obstante poseer cierta experiencia limitada en la
enseñanza, desde que se casó ha dedicado la mayor parte del
tiempo a actividades propias del hogar.

Por serias desavenencias habidas al cabo de 13 años de
casados, en el año 1974 ella presentó demanda de divorcio.
En 6 de agosto de 1975 el Tribunal Superior, Sala de San
Juan, disolvió la unión entre las partes, concediéndole a la
madre la patria potestad y custodia de los hijos menores. Poco
tiempo después, el padre se enteró a través de sus hijos que
ella tenía el propósito de irse a residir a los Estados Unidos.
Radicó ante el tribunal una moción solicitando orden para
que se le prohibiera sacar los niños fuera de Puerto Rico ya
que ello menoscababa su derecho a mantener relaciones pa-
terno-filiales. Ella compareció y alegó que su deseo era residir
junto a sus hijos en el estado de New York donde vivián sus
padres. Dada esa razón, y en vista de que su empleo le re-
quería viajar frecuentemente a New York, Ferrer accedió al
traslado de residencia de sus hijos. Tal consentimiento se hizo
formar parte de una estipulación que fue adoptada por el foro
de instancia el 2 de octubre de 1975.

Así las cosas, a fines del mes de octubre de 1975, la madre, sin notificación previa, se trasladó con los niños a Newport Beach, California y no al estado de New York como se había acordado. Ferrer se enteró posteriormente y a mediados del mes de diciembre de 1975, se personó a Newport Beach, California a visitar a los niños. Al llegar allí encontró que su ex-esposa se encontraba viviendo extramaritalmente con un hombre de nacionalidad sueca, el cual había conocido en Puerto Rico. De inmediato le comunicó su opinión de que tal relación no era propicia al bienestar emocional de los menores, exhortándole que pusiera fin a la misma. Además le requirió que se fuese a vivir a New York, que era el lugar donde habían estipulado que residiese junto a los niños. Ella se negó informándole que tenía planes de contraer matrimonio con dicha persona en breve tiempo.

A los pocos días, Ferrer regresó a Puerto Rico en compañía de sus hijos para disfrutar las vacaciones correspondientes a la época navideña, todo ello con el consentimiento de la madre y acorde a la resolución del tribunal que regulaba las relaciones paterno-filiales. Ya en Puerto Rico, sin dilación alguna, radicó solicitud para que le fuese concedida la custodia permanente de los menores. Adujo que la relación concubinaria de la madre con otro hombre era perjudicial al desarrollo emocional de los niños y que el traslado a California constituía un incumplimiento a la estipulación adoptada; más aún, alegó que ésta se proponía irse a residir a Londres con su concubino, llevándose a sus hijos, lo cual le privaría totalmente de mantener relaciones paterno-filiales. Solicitó como remedio provisional la custodia temporal. Ambas solicitudes fueron notificadas a la madre Susan Nudelman.

La sala de instancia con fecha de 19 de diciembre de 1975, le concedió la custodia provisional de los menores y ordenó a la División de Trabajo Social del Tribunal que realizara una investigación y rindiera un informe sobre a quién se le debería conceder la custodia definitiva, y las condiciones anticipables en que residirían los menores junto al padre o junto a

la madre. Mientras todo esto ocurría, el mismo mes de diciembre, Susan Nudelman terminó sus relaciones extramaritales, debido a que su compañero le comunicó que no estaba dispuesto a convivir con sus hijos. Ante ese suceso decidió irse a vivir a un apartamento en la ciudad de San Francisco, California, donde de inmediato inició gestiones por conseguir un empleo como sicóloga. No obtuvo éxito, sin embargo consiguió un empleo a tiempo parcial en calidad de vendedora en una galería de arte.

El 10 de marzo de 1976 comenzaron las vistas referentes a la solicitud de custodia permanente. Al inicio de las mismas la recurrida Nudelman, quien había venido a Puerto Rico para tal ocasión, solicitó con éxito del tribunal, que se alterase el orden de la prueba ya que se tenía que ausentar de Puerto Rico debido a compromisos de su nuevo empleo. Tal prueba consistió de su propio testimonio. Atestó que se encontraba residiendo en California y no en New York como se había estipulado, ya que ella entendía que podía vivir en cualquier lugar de los Estados Unidos y que consideraba que en California existía un ambiente más propicio para criar a sus hijos. Aceptó que vivió extramaritalmente con un hombre, pero que tal relación había finalizado. Señaló además que residía ahora en un apartamento en San Francisco, cerca de buenas escuelas y facilidades recreativas, y que le interesaba criar a sus hijos en aquel ambiente que les ofrecía mayor diversidad de actividades tanto a los niños, como a ella en su calidad de artista. Expuso que se ausentaba tan rápidamente de Puerto Rico, sin aún haberse visto el caso en su totalidad, debido a que no quería perder el empleo que con tanto esfuerzo había conseguido. (\*) Por último señaló que sus padres no residían en New York sino en Florida, por lo que ya no contaba con familiares cercanos en el primer estado.

---

(\*) El Informe Social de California, al cual nos referiremos más adelante, consigna la dificultad que existe de lograr en dicha área un buen empleo.

Finalizadas las vista donde se desfiló el anterior testimonio, con fecha de 17 de mayo de 1976, el trabajador social Jesús M. Vélez rindió el primer informe sobre la custodia de los menores, el cual concluye en síntesis—luego de una recapitulación de las entrevistas realizadas a las partes y a los niños—que ambos padres están capacitados para cuidar y educar a sus hijos.(¹) En adición, para el 1 de junio de 1976 se recibió en el tribunal un informe rendido por una trabajadora social del Estado de California, respecto a las condiciones de la residencia de la recurrida. En el mismo se hace un recuento de una entrevista que le hicieran a la madre en California y concluye que ésta muestra interés y planificación en sus asuntos. Además el informe consigna que el apartamento en que ella vive es uno limpio y adecuado, así como el sector donde está ubicado.

Subsiguientemente, el 29 de julio de 1976, sin aún el recurrente Ferrer haber presentado su prueba, el tribunal dictó Resolución determinando que éste debía entregar a la madre Nudelman la custodia de los menores. No conforme, radicó solicitud para que se dejara sin efecto la anterior resolución debido a que todavía no había desfilado prueba en apoyo de su petición sobre custodia permanente. El tribunal dejó sin efecto esta resolución.

En la continuación del proceso testificaron el recurrente Miguel A. Ferrer, su madrastra Anita Vicente de Ferrer,(²)

---

(¹) En la entrevista que les hiciera el trabajador social a los niños, éstos no supieron decir con cuál de sus padres desearían permanecer.

(²) La señora Vicente de Ferrer declaró en síntesis que cuidaba a los niños, conjuntamente con otro nieto, desde las 3:00 P.M. hora en que salían de la escuela, hasta las 6:00 P.M. hora en que el recurrente los recogía (T.E. de 22 de sept. de 1976, pág. 40); que su relación con los niños era muy estrecha y que los consideraba como sus nietos (T.E. de 22 de sept. de 1976, pág. 39); y que estaría dispuesta a continuar cuidándolos a esas horas (T.E. de 22 de sept. de 1976, pág. 42). Respecto a si en ocasiones cuidaba los niños fuera de ese horario, contestó que a veces por circunstancias imprevistas que se le presentaban al padre y éste no los podía recoger a las 6:00 P.M. entonces ella les hacía comida y se quedaba con ellos hasta que él los viniera a buscar.

la señora Betty Harper, ([3]) principal de la escuela donde estudian los niños, y los sicólogos, doctores José M. Del Valle y Agustín García.

El testimonio del recurrente básicamente enfocó lo alegado en su petición de custodia permanente. Reconoció que su ex-esposa era una buena madre (T.E. de 9 de sept. de 1976, pág. 30), y expresó que cuidar a sus hijos le representaba un gran sacrificio (T.E. de 9 de sept. de 1976, pág. 71). Expuso que desde que se le había concedido la custodia provisional, había tenido que renunciar a la representación que poseía para Sur América de la compañía para la cual trabaja, así como a un sinnúmero de viajes que anteriormente realizaba al extranjero en gestiones de su trabajo. Describió la rutina diaria con los niños de la siguiente manera: por la mañana, los levanta y les prepara desayuno, ([4]) luego los lleva a la escuela y a las seis de la tarde los va a buscar a la casa de su madrastra quien se los cuida desde que salen de la escuela, entonces los lleva al apartamento y les prepara comida y posteriormente los acuesta. ([5]) Por último, a preguntas de su representación legal aceptó que tenía una amiga, la cual era maestra y que era amiga de los niños. (T.E. de 9 de sept. de 1976, págs. 74–76.)

Es revelador el testimonio de los dos sicólogos que participaron en el caso. Ambos peritos consideran que los niños mantienen buenas relaciones con sus padres. (Testimonio del Dr. Del Valle, T.E. de 22 de sept. de 1976, págs. 12, 17, 18; y testimonio del Dr. García, T.E. de 24 de sept. de 1976, pág.

([3]) La señora Harper atestó esencialmente, que conocía a los niños y que éstos se desempeñaban normalmente en la escuela. (T.E. de 22 de sept. de 1976, págs. 34–37.)

([4]) En uno de los Estudios Sociales realizados en el caso, el recurrente le informó al trabajador social que los niños se preparaban un desayuno frugal.

([5]) Esa rutina fue calificada por el juez de instancia en su sentencia "como una situación un tanto ilógica y artificial que no podrá mantener permanentemente el recurrente, dadas las múltiples obligaciones que conlleva su empleo."

24A.) Por su parte el Dr. Del Valle favoreció que los niños permanecieran en Puerto Rico ya que aquí han establecido relaciones estrechas con parientes cercanos, amigos de su misma edad, así como que se han acoplado a la escuela donde estudian (T.E. de 22 de sept. de 1976, pág. 11; T.E. de 30 de sept. de 1976, págs. 35, 40, 41). Favoreció que el padre tenga la custodia de los menores ya que así éstos permanecerán en Puerto Rico. El Dr. García, por otro lado, considera que los niños deben permanecer bajo la custodia de su madre, dado que los mismos se encuentran en épocas sumamente difíciles del crecimiento, y su madre les puede ser de mejor ayuda en tales etapas. (T.E. de 24 de sept. de 1976, págs. 84, 93, 98–99, 100.) Ambos sicólogos son de opinión que la madre, en términos generales, es la persona mejor preparada para ayudar a una hija cuando ésta se encuentra en la etapa de entrar a la adolescencia, como es el caso de Ileana. (Dr. Del Valle, T.E. de 22 de septiembre de 1976, págs. 98–99, 100.) Respecto a Mickey, el menor de los hijos, el Dr. García considera que éste necesita la seguridad de un hogar, ya que la situación de desplazamiento continuo entre la escuela, la casa de la abuela y el apartamento del padre, no propende a su bienestar ni mejor sentido de seguridad emocional. (T.E. de 22 de sept. de 1976, pág. 98; T.E. de 24 de sept. de 1976, pág. 106.)

Respecto a la capacidad con que cuentan los niños para tomar la importante decisión de con cuál padre desearían permanecer, ambos sicólogos coincidieron que tanto Ileana como Mickey, no tienen la suficiente madurez y capacidad, ni los elementos de juicio adecuados para tomar por sí solos tal decisión.([6]) (Dr. Del Valle, T.E. de 30 de sept. de 1976, págs. 40–41—respecto a madurez de Ileana, Dr. García, T.E. de 24 de sept. de 1976, pág. 82.) El Dr. Del Valle inclusive expresó

---

([6]) Ello lo confirma el hecho de que en las entrevistas que les hicieron los trabajadores sociales a los niños, éstos no expresaron preferencia sobre con cuál de los padres deseaban vivir.

que la tendencia que le mostraron los niños a permanecer en Puerto Rico junto a su padre podría deberse a que durante los últimos meses han estado bajo la custodia provisional de éste, y puede haberles influido. (T.E. de 22 de sept. de 1976, pág. 23); y que a pesar de ello él considera que los niños mantienen su objeción a tener que tomar ellos la decisión de con cuál de los progenitores permanecer. (T.E. de 22 de sept. de 1976, pág. 33.)

Por último, ambos peritos consideran que es posible que los niños no se acostumbren al principio al ambiente de California, pero que ello es natural y consideran que éstos podrán hacer los ajustes que requiera tal cambio de residencia. (Dr. García, T.E. de 24 de sept. de 1976, pág. 70; entrevista al Dr. Del Valle realizada por la trabajadora social, la cual hizo formar parte de su Informe.)

Cabe señalar que durante el transcurso de la presentación de prueba antes reseñada, el tribunal ordenó se realizara otro Informe Social sobre la custodia de los niños. En este segundo informe se reafirma la conclusión de que ambos padres están capacitados para ejercer la custodia de los niños, no obstante la trabajadora social estima que el hogar paterno les ofrece más seguridad y bienestar a los menores por lo que recomienda al tribunal le conceda la custodia permanente al padre. Es significativo mencionar que en el informe se consigna que los niños pueden adaptarse con facilidad a vivir con cualesquiera de los dos padres, y que éstos en las entrevistas realizadas, no supieron expresar con cuál de sus progenitores deseaban permanecer.

Finalmente, el 6 de diciembre de 1976, el tribunal de instancia dictó resolución donde reiteró la concesión a la madre de la custodia de sus hijos, la autorizó a residir junto a éstos en el estado de California, impuso al recurrente el pago de $1,000.00 mensuales por concepto de pensión alimenticia para sus hijos, más las costas del proceso y honorarios de abogado.

El recurrente radicó moción de reconsideración a la anterior resolución, debidamente fundamentada. En vista de ello

el tribunal ordenó una nueva evaluación del lugar y circunstancias en que la recurrida estaba viviendo junto a sus hijos. En 9 de marzo de 1977 sostuvo su anterior resolución.

A solicitud del padre, Miguel A. Ferrer, acordamos revisar. Ante nos argumenta los siguientes errores:

PRIMERO: "Erró el Honorable Tribunal de Primera Instancia y actuó impropiamente al no inhibirse y entrar a considerar el presente caso luego de haber recibido carta personal sumamente impropia y libelosa de la recurrida de fecha 15 de julio de 1976 y/o al no poner en conocimiento del recurrente dicha carta para darle oportunidad a éste de pedir su inhibición."

SEGUNDO: "Erró el Honorable Tribunal de Primera Instancia al predicar su Resolución en el presente caso a base del caso *Muñoz* v. *Torres,* 75 DPR 507 y conceder la custodia de los menores hijos de las partes a la recurrida para que ésta los traslade a California."

TERCERO: "Erró el Honorable Tribunal de Primera Instancia al no entrevistar a los menores sobre su preferencia respecto con quién y en qué lugar querían permanecer."

CUARTO: "Erró el Honorable Tribunal de Primera Instancia al llegar a las conclusiones que más adelante copiaremos ya que las mismas no se ajustan a los hechos ni a la prueba presentada."

QUINTO: "Erró el Honorable Tribunal de Primera Instancia al condenar al recurrente al pago de honorarios de abogado y al pago de la suma de $1,020.00 de pasajes de la recurrida para trasladarse a Puerto Rico para la vista del caso."

## I

Consideremos el primero. En éste se hace mención a una carta que le envió la recurrida Nudelman al ilustrado juez de instancia el 15 de julio de 1976. En dicha comunicación, en síntesis, ella primeramente informa que se encuentra sin representación legal debido a que su abogado acababa de renunciar y luego expone ciertas alegaciones sobre los hechos que se ventilaban ante el tribunal. La tesis de la parte recurrente es en el sentido de que el juez erró al no inhibirse luego de recibir esta carta, o en la alternativa no haberle informado

sobre su existencia para entonces pedir su inhibición. Inclusive considera que dicha carta motivó la resolución de 29 de julio de 1976 en la cual se dispuso inicialmente de la controversia sobre la custodia, sin haberse oído su prueba.

■ Hemos reflexionado sobre el particular. Ciertamente consideramos censurable que cualquier parte en un litigio— en este caso la recurrida—escriba al magistrado que preside una causa; con énfasis hemos de reafirmar que en nuestro sistema de justicia toda persona debe comprender que las alegaciones se prueban y demuestran a través de los trámites y medios evidenciarios establecidos en ley.

■ Las causas para la inhabilitación de un juez, sea a iniciativa propia o a solicitud de parte, establecidas en la Regla 63.1 de las de Procedimiento Civil son las siguientes:

"(a) Por estar interesado en su resultado o tener prejuicio o parcialidad hacia cualquiera de las partes o sus abogados.

(b) Por existir parentesco o consanguinidad o afinidad con cualquiera de las partes dentro del cuarto grado, o con cualquiera de sus abogados dentro del tercer grado.

(c) Por haber sido abogado o consejero de cualquiera de las partes en el pleito pendiente ante él, o fiscal en una investigación o proceso criminal donde los hechos fueren los mismos que habrían de ser sometidos a su resolución."

■ De existir en el caso de autos algún motivo para inhibición, obviamente sería el contemplado en el inciso (a) antes transcrito, ya que los otros dos son inaplicables. No podemos convenir con la conclusión propuesta en el sentido de que el simple hecho de que un juez reciba una carta de uno de los litigantes sugiera o implica que dicho funcionario está interesado en el resultado del pleito o tener prejuicio o parcialidad hacia cualquiera de las partes o sus abogados.(7) De no

_____

(7)En *Pueblo* v. *Maldonado Dipiní,* 96 D.P.R. 897, 910 (1969), expresamos que el prejuicio o parcialidad que es motivo para la inhibición del juez debe ser personal contra la parte y no de índole judicial. Allí se indicó, en adición, a que por prejuicio personal nos referíamos a una actitud de origen extrajudicial, que el haber el juez intervenido en otros casos an-

ser así bastaría que una de las partes—o un tercero a nombre de ésta—enviara una carta personal a un juez que preside un caso para originar un motivo de inhibición. Rechazamos tal resultado porque afectaría seriamente nuestro sistema de justicia y pondría en duda la respetabilidad, ecuanimidad y objetividad de nuestra judicatura.

Por otro lado, la relación de causa y efecto que hace el recurrente entre la carta en cuestión y las conclusiones a que llega el juez en la mencionada resolución de 29 de julio de 1976, es de naturaleza especulativa. Alega que el tribunal llegó a ciertas determinaciones en tal resolución, las cuales no se hubiesen podido establecer de no haber el magistrado utilizado la información suplida en dicha comunicación.[8] Al hacer esta imputación pierde de vista que tales hechos estaban accesibles mediante el examen del Informe sobre custodia de menores realizado por el trabajador social entregádole al tribunal desde el 17 de mayo de 1976. En dicho Informe se hace un recuento de las entrevistas realizadas a las partes y surge base suficiente para la determinación fáctica en cuestión.[9] Resolvemos que el error no fue cometido.

---

teriores distintos en contra de unos mismos acusados, no era suficiente motivo para demostrar prejuicio personal.

[8] Las mencionadas determinaciones fueron las siguientes:

"Por otra parte, aunque el demandado también demuestra genuino interés en sus hijos y es persona de recursos económicos nos parece que sus múltiples obligaciones como hombre de negocios lo mantienen fuera del hogar durante el día y probablemente durante muchas noches, por lo que los niños estarán gran parte del tiempo al cuidado de otras personas que podrán ser muy buenas personas pero sin duda no pueden igualar el calor amoroso de la madre. Ante estas circunstancias nos parece que conviene mejor a los niños volver al anterior sistema de estar bajo la custodia de la madre durante el año escolar y con el demandado durante los períodos de vacaciones.

"De conformidad con ello, el demandado deberá devolver la custodia de los niños a la demandante y continuar depositando los alimentos ya anteriormente determinados en $1,200.00 mensuales."

[9] De todos modos la referida Resolución no tuvo ulteriores consecuencias por haber sido dejada sin efecto posteriormente por el juez a solicitud del propio recurrente.

## II

En su segundo señalamiento, el recurrente alega que la sala de instancia cometió error al aplicar al caso de autos la regla enunciada en *Muñoz* v. *Torres*, 75 D.P.R. 507 (1953), al efecto de que en este tipo de caso los tribunales deben generalmente preferir a la madre al conceder la custodia permanente, salvo que concurran circunstancias excepcionales que justifiquen el privarla de ella. Su teoría es que tal norma quedó sin efecto luego de la decisión de *Marrero Reyes* v. *García Ramírez*, 105 D.P.R. 90 (1976). Aduce una incongruencia entre la regla enunciada en *Marrero*, supra, al efecto de que ". . . las determinaciones sobre custodia deben guiarse principalmente por el bienestar y los mejores intereses del menor. . . .", y la presunción en favor de la madre descrita en *Muñoz*, y la aparente incompatibilidad resultante de esa presunción con el pronunciamiento en *Marrero*, de que no existe una regla mecánica preceptiva de que los padres biológicos deben prevalecer siempre al determinarse la custodia.

Un análisis de nuestra decisión en *Marrero*, supra, demuestra que la misma no conlleva el conflicto jurisprudencial que le adjudica el recurrente. En su correcta perspectiva dicho caso reiteró con mayor profundidad y erudición la doctrina rectora previamente adoptada por este Tribunal, y ahora estatuida en el Art. 107 de nuestro Código Civil,([10])

---

([10]) La Ley Núm. 100 de 2 de junio de 1976 enmendó el Art. 107 del Código Civil del siguiente modo:

"En todos los casos de divorcio los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el Tribunal, *en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos:* pero el otro cónyuge tendrá derecho a continuar las relaciones de familia con sus hijos, en la manera y extensión que acuerde el Tribunal al dictar sentencia de divorcio, según los casos.

"El cónyuge que haya sido privado de la custodia y la patria potestad tendrá derecho a recobrarlas si acreditare ante cualquier sala competente del Tribunal Superior el fallecimiento del otro ex-cónyuge o demostrase a satisfacción del tribunal que a los mejores intereses y bienestar de los menores conviene la referida recuperación de la custodia y la patria potestad." (31 L.P.R.A. sec. 383.) (Bastardillas nuestras.)

de que en la determinación de la custodia de menores, los tribunales deberán guiarse siempre por el bienestar y los mejores intereses del menor. *N.N.N.* v. *N.N.N.*, 95 D.P.R. 291 (1967); *Castro* v. *Meléndez*, 82 D.P.R. 573 (1961); *Llopart* v. *Mesorana*, 49 D.P.R. 250 (1935); *Blanco* v. *Hernández*, 32 D.P.R. 22 (1923); *Chabert* v. *Sánchez*, 29 D.P.R. 241 (1921). Tal regla necesariamente no choca con una preferencia básicamente en favor de la madre cuando los progenitores se encuentran en igualdad de condiciones. Esta nace de la propia doctrina del bienestar del menor. (11) Tampoco milita en contra el que en *Marrero* v. *García*, supra, se hiciera mención de la no existencia de una presunción a favor de los padres biológicos frente a otras personas que pretenden la custodia. Nos explicamos.

Admitimos que hoy en día se pone en duda y cuestiona la generalidad de que la madre sea la persona más capacitada para cuidar de sus hijos, conclusión que ha sido premisa cardinal para la creación estatutaria e interpretación judicial de preferencia hacia ella en la determinación de conflictos sobre custodia de hijos. (12) *The Father's Right to Child Custody in Interparental Disputes*, 49 Tulane L. Rev. 198 (1974); *Child Custody: Preference to the Mother*, 34 La. L. Rev. 881, 885 (1974); Podell, Peck and First, *Custody—To*

---

(11) Resulta curioso el hecho de que el Art. 98 del Código Civil ha permanecido inalterado. En el mismo se establece cierta preferencia por la madre en la custodia provisional de los hijos durante el transcurso del pleito de divorcio. Expone ese precepto:

"Si hubiese hijos del matrimonio cuyo cuidado provisional pidieran ambos cónyuges, serán puestos bajo el cuidado de la mujer, mientras el juicio se sustancie y decida, a menos que concurran razones poderosas a juicio del Tribunal Superior para privar a la mujer del cuidado de sus hijos en todo o en parte." (31 L.P.R.A. sec. 341.)

(12) Hay autores que señalan ". . . que la creencia de que la madre puede brindar mejor custodia a los menores es errónea desde el punto de vista histórico, económico, sociológico y filosófico." En adición expresan que "tal creencia es infundada ya que no visualiza la unidad familiar luego del divorcio, donde la madre tiene que asumir el rol de madre y de padre a su vez." Podell, Peck and First, *Custody—To Which Parent?*, 56 Marq. L. Rev. 51, 53 (1973). (Traducción nuestra.)

*Which Parent?*, 56 Marq. L. Rev. 51 (1973), Comment, *Measuring the Child's Best Interests—A Study of Incomplete Considerations*, 44 Denver L.J. 132 (1967). Entre las razones principales para este enfoque, se proponen: (a) el hecho de que en la sociedad contemporánea, la mujer ha asumido roles—voluntaria o involuntariamente—que han incrementado su posición económica; [13] (b) la falta de evidencia científica de peso, que demuestre que como regla general la madre juega un papel de mayor importancia que el padre en el desarrollo de los hijos; [14] y (c) la duda que existe de si la preferencia en favor de la madre es constitucional. [15] *The Father's Right to Child Custody in Interparental Disputes*, supra, págs. 198-202.

---

[13] En Puerto Rico, según expusimos en *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 280 (1975), ". . . resulta evidente la creciente incorporación de la mujer a las diversas fases de la actividad económica desplegada por nuestro pueblo poniendo en entredicho su clásica función que gira sobre el hogar. Ello constituye un esfuerzo legítimo de la mujer tendente a alcanzar mejores oportunidades de auto-expresión, reconocimiento personal y de sostén para sí y su familia."

[14] Bradbrook, *The Relevance of Psychological and Psychiatric Studies to The Future Development of the Laws Governing the Settlement of Inter-parental Child Custody Disputes*, 11 J. Fam. L. 557, 579-585 (1971).

[15] Varios autores consideran que la distinción que tal preferencia crea, es inconstitucional por ser una discriminación en base al sexo, la cual ha sido clasificada por el Tribunal Supremo Nacional como sospechosa y sujeta a un escrutinio estricto de parte de los Tribunales. *The Father's Right to Child Custody in Interparental Disputes*, supra, págs. 201-202; *Child Custody: Preference to the Mother*, supra, págs. 884-885. Señalan para sustentar tal conclusión los casos de *Reed* v. *Reed*, 404 U.S. 71 (1971); *Stanley* v. *Illinois*, 404 U.S. 645 (1972) y *Frontiero* v. *Richardson*, 411 U.S. 677 (1973) (Opinión que no contó con una firme y absoluta mayoría del Tribunal).

En *Reed* se declaró inconstitucional una ley que daba preferencia al padre sobre la madre para ser nombrado administrador de los bienes de su hijo, por la misma discriminar por razón de sexo. Por su parte, en *Stanley* se declaró inconstitucional una ley que privaba al padre soltero de una vista para demostrar su capacidad para tener la custodia de su hijo, antes de que el niño fuera puesto al cuidado del Estado debido a la muerte de su madre. En *Frontiero*, en opinión igualmente dividida, se decidió que era inconstitucional por discriminar por razón de sexo, el que un hombre miembro del servicio militar pudiera reclamar como dependiente a su es-

■ La lectura de la profusa literatura científica y jurídica sobre este tema nos lleva a reafirmar el criterio normativo de que en casos de custodia, la estrella polar que debe orientar a los tribunales, funcionarios sociales y abogados es el mejor bienestar de los menores a la luz de los siguientes factores:

". . . la preferencia del menor, su sexo, edad y salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes. Oster, *'Custody Proceedings: a Study of Vague and Indefinite Standards'*, 5 J. Fam. L. 21, 22 (1965); Clark, *op. cit.*, 591 y ss.; Taylor, *'Child Custody Problems in Illinois'*, 521, 522,

---

posa con el propósito de recibir unos mayores beneficios; y que la mujer también miembro del servicio militar no pudiera reclamar lo mismo respecto a su esposo.

Véase además: *State ex rel. Watts* v. *Watts*, 350 N.Y.S.2d 285 (1973), donde se declaró impermisiva en el estado de Nueva York la preferencia a favor de la madre a la luz de los casos reseñados.

Cabe señalar también que en los estados de Colorado, Florida, Minnesota, Nebraska y Wisconsin se han aprobado estatutos que expresamente prohíben a los tribunales discriminar en contra del padre en la concesión de la custodia de sus hijos: Colo. Rev. Stat. Ann. 46-1-5(7) (Supp. 1967); Fla. Stat. Ann. Sec. 61.13(2) (Supp. 1974); ch. 107, Sec. 14, (1974) Minn. Acts 145; Neb. Rev. Stat. Sec. 42-311 (Supp. 1971); Wis. Stat. Ann. Sec. 247.24(3) (Supp. 1974). En adición, los estados de Michigan y California han derogado leyes concediendo preferencia a la madre en la custodia de sus hijos. Mich. Stat. Ann. Sec. 25.312(5) (Supp. 1974); Cal. Civ. Code Sec. 4600 (Supp. 1974).

En varios estados donde existía jurisprudencialmente la doctrina de preferencia a la madre, recientemente se ha rechazado. Véanse *In Re Marriage of Bowen*, 219 N.W.2d 683, 688 (Iowa 1974); *Commonwealth ex rel. Foster* v. *Foster*, 311 A.2d 663, 665 n. 6 (Pa. Super. 1973); *Minjarez* v. *Minjarez*, 495 S.W.2d 630 (Texas Civ. App. 1973).

En Louisiana todavía subsiste jurisprudencialmente la preferencia por la madre al conceder la custodia de los niños. *Drouin* v. *Hildenbrand*, 105 So.2d 532 (1958); *Estopinal* v. *Estopinal*, 66 So.2d 311 (1953). Allí no se ha adoptado la doctrina del bienestar y los mejores intereses del menor. Tales posiciones han sido criticadas recientemente: *Child Custody: Preference to the Mother*, supra; *The Father's Right to Child Custody in Interparental Disputes*, supra.

n. 3 (1975); Calloso, *'Custody of the Child and the Uniform Marriage and Divorce Act'*, 18 S. Dak. L. Rev. 551 (1973). Véanse: *Bermúdez* v. *Tribunal Superior*, 97 D.P.R. 825 (1969); *Castro* v. *Meléndez*, 82 D.P.R. 573 (1961); *Rodríguez* v. *Torres*, 80 D.P.R. 778 (1958). Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en asunto de tan extrema dificultad." *Marrero*, supra.

■ Advertimos sin embargo, que si luego de analizados todos los factores envueltos, *la madre se encuentra esencialmente en la misma posición que los demás*, incluyendo al padre—en ausencia de otras circunstancias excepcionales que justifiquen lo contrario—la custodia debe serle adjudicada. Influye en nuestro espíritu el que generalmente la madre, por ley natural no escrita dimanante de imperativos biológicos, y arraigada profundamente en nuestras conciencias—con reconocimiento casi universal—es la persona que con más dedicación, celo y cariño cuida de sus hijos. 2 Nelson, *On Divorce: Mother Favored by Law*, Sec. 1509, págs. 227, 237 (1961); *Santos* v. *Berdecía*, 73 D.P.R. 766 (1952); *Rodríguez* v. *Pagán*, 67 D.P.R. 345 (1947); *Fernández* v. *Martínez*, 59 D.P.R. 548 (1941). No podemos pasar por alto de que en Puerto Rico nuestra visión de pueblo fundada en la realidad de una cultura de origen hispánico, en su jerarquía de valores comunitarios todavía percibe a la mujer como el alma en que se desenvuelve la vida familiar: *Zachry International* v. *Tribunal Superior*, supra, 283. Ello no devalúa la importancia de la figura paterna. Los padres, aunque en apariencia y de ordinario sean menos expresivos, también comparten un ideario y una esperanza hacia el bienestar de los hijos. Sobre el particular, el caso de autos es un digno ejemplo.

## III

■ Teniendo presente lo expuesto, analicemos los factores en juego. Hemos mencionado previamente que los menores Ileana y Mickey en las entrevistas realizadas por los sicó-

logos y trabajadores sociales no supieron expresar concretamente su preferencia respecto a con cuál de sus progenitores deseaban vivir.([16]) Ambos peritos coincidieron en que los niños no tienen la suficiente madurez intelectual como para poder decidir con quién desean permanecer y expresaron que se encuentran en etapas difíciles de su desarrollo. Aunque los dos gozan de buena salud física, la niña por un lado está por entrar a la adolescencia y necesita de cierta orientación para afrontar los cambios inherentes a esa etapa de crecimiento. En torno a este extremo, los dos sicólogos consideran que como regla general es la madre quien le puede brindar la orientación necesaria. En cuanto al niño, debido a su corta edad considera uno de los peritos que necesita una seguridad emocional la cual no posee todavía, y que el estar cambiando de hogar, así como el desplazamiento continuo entre la escuela, la casa de su abuela y el apartamento de su padre, lo están afectando emocionalmente.([17])

Respecto a la relación afectiva entre las partes y los niños, no hay duda, según surge de la prueba que tanto el padre como la madre le tienen sumo cariño y que están dispuestos a

---

([16]) Si bien es cierto que en una fase de los procedimientos mostraron interés de permanecer en Puerto Rico, el Dr. Del Valle expresó que ello podía deberse a que hacía once meses que se encontraban residiendo con su padre y éste pudo haber influido en ellos. (T.E. pág. 23.) Debemos recordar que en estos casos la preferencia del menor es sólo uno de los factores a considerarse y los tribunales no vienen obligados a seguirla indefectiblemente. *Centeno Alicea v. Ortiz,* 105 D.P.R. 523 (1977) ; *Irizarry* v. *Irizarry,* 98 D.P.R. 671 (1970) ; *Castro* v. *Meléndez,* 82 D.P.R. 573 (1961) ; *Rodríguez* v. *Pagán,* 67 D.P.R. 345 (1947) ; *Ríos* v. *Lafosse,* 59 D.P.R. 509 (1941) ; Vol. 383, The Annals: *Who Will Speak for the Child?,* págs. 34–47 (1969) ; Oster, *Custody Proceeding: A Study of Vague and Indefinite Standards,* 5 J. Fam. L. 21, 26 (1965).

([17]) Se ha expuesto que son perjudiciales tanto al menor como a sus parientes, las consecuencias de un pleito de custodia. De hecho se alega que los cambios temporeros que el mismo conlleva en cuanto a la propia custodia del menor envuelto, afectan a éste. *The Father's Right to Child Custody in Interparental Disputes,* supra, págs. 196–197. Sobre el daño emocional que esto puede ocasionar al niño véase Watson, *The Children of Armageddon: Problems of Custody Following Divorce,* 21 Syracuse L. Rev. 55, 63–64 (1969).

criarlos. En este sentido, resulta lamentable, al igual que en otros casos, la disolución del matrimonio habido entre las partes. Subsiste un elemento de cohesión significativo a través del amor que ambos profesan a ellos que trasciende las distancias geográficas de haber los padres nacido en países distintos. Ahora bien, aceptada la realidad del divorcio—y que el sueño anhelado de todo hijo de compartir su crecimiento en unión a ambos padres se ve tronchado—creemos, independientemente de esta limitación y otras, que junto a cualesquiera de sus progenitores los niños razonablemente verán cumplimentadas sus necesidades afectivas, morales y económicas. Aun cuando aceptamos la alegación del recurrente de que la relación extramarital de la recurrida moralmente no les era propicia; advertimos que para la época en que se dispuso en instancia la custodia, esta circunstancia ya había desaparecido.[18] Con referencia al factor económico, resalta a la vista que el padre es una persona sumamente solvente y no tendría dificultad en la manutención de los niños; en cuanto a la madre si bien es cierto que sus recursos económicos son limitados en relación a los del padre, ello por sí solo, no es factor determinante ya que la imposición al padre de una pensión alimenticia razonable subsana y remedia la desigualdad pecuniaria existente: *Santos* v. *Berdecía*, 73 D.P.R. 766 (1952).

---

[18] En *Muñoz* v. *Torres*, supra, la madre de la menor había vivido anteriormente en público concubinato con un hombre. Allí dijimos:

"El hecho de que ella haya vivido, *previamente*, en concubinato con otro hombre, en la misma casa con la niña, no conlleva la existencia, o la probabilidad de que exista en el futuro, un ambiente de inmoralidad y corrupción tal, que quede lesionada la personalidad moral de la niña, hasta el punto de que se prive a la madre de la custodia. En *Fernández* v. *Martínez*, supra, el padre de un niño de poca edad presentó una petición de hábeas corpus contra la madre, alegando, esencialmente, que ella había estado viviendo en concubinato con otro hombre, en la misma casa donde vivía el niño. Se resolvió que, en vista especialmente de que desde varios meses antes del juicio ella ya no vivía en concubinato con el otro hombre, el menor debía quedar bajo la custodia de la madre, debiendo declararse sin lugar la petición de hábeas corpus." Págs. 513–514.

En adición, es necesario sopesar en qué medida los niños pueden ajustarse al hogar, escuela y a la comunidad en que residen o van a residir.

Sobre estos extremos, en sus informes los trabajadores sociales expusieron que eran adecuadas las condiciones de vivienda tanto del padre en Puerto Rico como las de la madre en California. Concurrimos con dicha observación. Además coincidimos con el juicio valorativo de los sicólogos en el sentido de que un cambio de hogar hacia California conllevará un nuevo ajuste; ambos consideran que no les afectaría.[19] No obstante el Dr. Del Valle es del criterio de que precisamente porque los niños han residido aquí casi toda sus vidas, y se han ajustado al ambiente y a la educación escolar, deberían permanecer en Puerto Rico. Aun cuando reconocemos su preocupación, creemos que el impacto emocional inicial será pasajero y de consecuencias análogas a aquellas que experimentan una parte sustancial de la población infantil en constante movimiento en un mundo contemporáneo de adultos que se desenvuelve en continua movilidad por razones económicas, ocupacionales, personales y de otras índoles.

Sobre la educación académica, después de regresar de California, los niños asistieron a una escuela privada, en donde según lo testificado por el recurrente Ferrer y la principal del plantel, se han desempeñado normalmente. La recurrida Nudelman ha testificado por su parte, que de concedérsele la custodia, los matriculará en una de las escuelas públicas del sector donde reside en San Francisco, cuyo centro de enseñanza y facilidades físicas son estupendas. Añadió que de alcanzarle el dinero, los matricularía en un colegio privado. De hecho mientras los menores vivieron en Newport Beach, California, en unión a la madre, asistieron a una escuela pública del sector donde no tuvieron problemas de aprendizaje,

---

[19] Es interesante que la niña a preguntas del Dr. Del Valle expresó alegría de estar en Puerto Rico porque conocía el ambiente, pero que también le gustaba California por ser un sitio diferente. (T.E. de 22 de sept. de 1976, pág. 16, Dr. Del Valle.)

ni aun con el idioma ya que hablan con fluidez el vernáculo y el inglés.

## IV

El análisis de los factores reseñados a la luz de los hechos expuestos, nos lleva a la conclusión que para el bienestar y los mejores intereses de los menores aquí envueltos, debe quedar inalterada la apreciación de la sala de instancia concediendo a la recurrida la custodia de sus hijos, así como la reglamentación fijada respecto a las relaciones paterno-filiales. Milita en nuestro ánimo el que los niños se encuentran en edades sumamente difíciles inherentes a su desarrollo y crecimiento, etapas de pre y adolescencia, en las cuales los sicólogos han expresado que la madre puede serles de significativa ayuda, particularmente a la niña.

Con esta perspectiva, carece de mérito el tercer error referente a la negativa del juez de instancia a entrevistar a los niños. En el caso de autos, la trascendencia de este factor había quedado limitada por el testimonio de los sicólogos y los informes de los trabajadores sociales, los cuales exponían claramente que los niños no sabían decir con quién preferían permanecer. En adición, ambos sicólogos coincidieron en que los niños no poseían la capacidad suficiente como para tomar una decisión informada, y testificaron que era posible que el deseo de los menores de permanecer en Puerto Rico se debiera a que el padre hubiese ejercido influencia sobre ellos durante los meses en que había tenido la custodia provisional de los mismos.

Aclaramos que si bien es deseable, los jueces no vienen obligados a entrevistar personalmente en todo caso de custodia a los menores sobre sus preferencias respecto a los progenitores. Elementos tales como la edad, grado de apreciación de los hechos y otros dictarán la pauta a seguirse. La preferencia de un menor, si bien es uno de los factores a examinarse, no tiene que llegar a conocimiento del tribunal sen-

tenciador necesariamente por boca del propio niño. La elección que haga un menor, si alguna, puede ser comunicada al tribunal por otras vías tales como el testimonio de uno de los padres u otros testigos e informes periciales presentados al tribunal. Lo importante es contar con certeza respecto a la determinación del niño y evaluarla con los demás ingredientes de prueba. Si un tribunal estimase que hay duda sobre este factor deberá entonces tomar las medidas pertinentes para lograr conocer el verdadero sentir del niño. No obstante, no debe perderse de vista que la preferencia expresada por el menor es sólo uno de los factores a considerarse en la determinación de su custodia. Al aquilatarse este elemento, es menester pesar la edad del menor y el grado de manipulación, consciente o inconsciente, que cualesquiera de los padres pueda haber ejercido—máxime cuando la situación se plantea a corta edad y existe un control casi absoluto de uno de ellos en comparación con el otro—y si el niño está lo suficientemente capacitado para evaluar y proyectar en todas sus dimensiones el alcance de su decisión.

El cuarto error señalado se refiere a ciertas conclusiones de hecho a que llegó el tribunal de instancia.[20] Las hemos confrontado con la prueba y no advertimos una apreciación errónea que amerite una variación de la decisión llegada. Las mismas han quedado aclaradas en la exposición de hechos que hemos relacionado en esta opinión.

---

[20] Relativas a los siguientes extremos: que la recurrida Nudelman no se trasladó a New York y sí a California en contravención a lo estipulado; el que el juez hiciera constar en su resolución que concedió inicialmente la custodia provisional al padre ". . . considerando la alegación que se intentaba llevar los niños a Europa"; que el tribunal concluyera que había otorgado nuevamente la custodia a la madre, sin haberse desfilado prueba por el recurrente; la determinación referente a la posible adaptación de los niños en California; sobre las razones que animan a la recurrida para irse a residir a dicho estado; las expresiones judiciales sobre la separación que acarrea un divorcio entre personas de jurisdicciones distantes; y el criterio judicial correspondiente a las labores del recurrente y sus arreglos para los niños.

## V

Por último, el recurrente sostiene como error la condena de honorarios de abogado y el pago de la suma de $1,020.00 en concepto de costas por los pasajes de la recurrida para trasladarse a Puerto Rico a la vista del caso.

En cuanto a los honorarios, su señalamiento debe prosperar y éstos deben eliminarse. De las determinaciones de hecho expuestas surge que los mismos no se justifican. El recurrente Ferrer actuó *bona fide* en la consecución de un remedio y la tramitación del caso no refleja temeridad. La génesis del proceso, así como los incidentes forenses que tuvieron lugar, respondieron a un interés genuino paternal ante una circunstancia que inicialmente y en apariencia era adversa para los niños. Desaparecida posteriormente, no se le debe penalizar por ejercitar un derecho legítimo en pro del bienestar de sus hijos.

En cuanto al pago de los pasajes aéreos de la recurrida Nudelman reclamado como costas del pleito, no le asiste la razón. Según expusimos en *Garriga, Jr.* v. *Tribunal Superior*, 88 D.P.R. 245, 253 (1963), "[l]as costas son los gastos incurridos necesariamente en la tramitación del pleito o procedimiento que la ley ordena que un litigante reembolse al otro, o autoriza al tribunal a así ordenarlo." No existe duda de que el testimonio de la madre era de vital importancia para poder el tribunal formular un dictamen judicial informado, máxime en un campo tan delicado y sensible como el de la custodia de menores.

*Se dictará sentencia confirmando la resolución del Tribunal Superior, Sala de San Juan, pero eliminándose los honorarios de abogado. En atención al tiempo transcurrido de separación habida entre los niños y la madre, la proximidad de las vacaciones de verano, las gestiones necesarias de prematrícula escolar y otras diligencias, conjuntamente con este dictamen proveemos no ha lugar a la reciente solicitud del recurrente pidiendo autorización para viajar a Europa con los*

*niños, y en su lugar disponemos—como parte del mandato—*
*que en o antes del 30 de junio de 1978—previa comunicación*
*y coordinación al efecto—proceda acompañarlos al hogar ma-*
*terno en San Francisco. Cualquier otro aspecto relativo a la*
*transferencia de la custodia, deberá ser referido por las*
*partes al tribunal de origen quien proveerá diligentemente el*
*remedio correspondiente compatible con lo aquí dispuesto.*

El Juez Presidente Señor Trías Monge y el Juez Asociado
Señor Martín no intervinieron. El Juez Asociado Señor Rigau
se inhibió. El Juez Asociado Señor Díaz Cruz anularía el
auto de revisión por indebidamente expedido.