# 2002 DTA 98

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL II – BAYAMON**
**Panel Sustituto**

MICHELLE ROSE LEMBO
Demandante-Peticionaria

v.

JORGE MAYENDIA VALDES
Demandado-Recurrido

Núm. KLAN-01-00799

San Juan, Puerto Rico, a 20 de mayo de 2002

Panel sustituto integrado por su Presidente, Juez Sánchez Martínez,
la Jueza Cotto Vives y el Juez Aponte Hernández

Sánchez Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Tenemos ante nos un desafortunado caso, en el que el bienestar de un menor se ha visto comprometido por la coincidencia entre la intensidad y acritud con que sus padres se disputan su custodia, un celo un tanto desmedido de parte de los abogados de ambas partes y la dificultad del sistema de tribunales para proveer, en ocasiones, continuidad y control a los casos.

La Sra. Michelle Rose Lembo, madre del menor de 11 años de edad Jorge Mayendía Lembo, conocido como Georgie, nos solicita la revocación de una sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 30 de julio de 2001, mediante la cual dicho foro adjudicó al padre, el Sr. Jorge Mayendía Valdés, la custodia del menor habido en el matrimonio entre ambos. La señora Lembo había solicitado, además de la petición de custodia, autorización para trasladarse a vivir con el menor al condado de Modena, en New York, lugar donde reside la familia de ella.

En la sentencia apelada, el Tribunal de Primera Instancia adoptó, esencialmente, las recomendaciones de la doctora Luz Minerva Guevara, siquiatra y perito del tribunal. Sin tomar una determinación expresa sobre la solicitud de autorización para mudarse con el menor a Modena, el foro *a quo* determinó que, a pesar de que ambas partes están facultadas para ejercer la custodia permanente de Georgie, ésta debe ser adjudicada al padre, porque es preferible que el niño permanezca en Puerto Rico —y asista a la escuela que ha asistido siempre— y que esté bajo la custodia del padre, en esta etapa de la vida del menor, por ser varón, para que consolide su identidad sexual. El tribunal apelado determinó, además, entre otros asuntos, que no era necesaria la admisión del informe de la trabajadora social, pues éste no desempeñaba un papel esencial para la adjudicación de la custodia, porque el informe *no constituye una evaluación ni siquiátrica ni social, sino una recomendación general a la luz de un cuadro.* ▪

En su alegato, la señora Lembo argumenta que el Tribunal de Primera Instancia erró, en primer lugar, al determinar los hechos y, segundo, al adjudicar la custodia a base de cuestiones de género y origen, utilizando únicamente las recomendaciones de la doctora Guevara, sin tener en cuenta ni la opinión de los otros peritos ni la recomendación de la Procuradora Especial de Relaciones de Familia —designada por el mismo foro como defensora judicial del menor—, así como, tampoco, la preferencia del niño.

Tras examinar la exposición narrativa presentada, la transcripción de la prueba oral de parte de la vista de custodia y los autos originales del Tribunal de Primera Instancia, que hemos elevado ante nos, estamos en posición de resolver.

Como veremos, la señora Lembo tiene razón.

### I

De acuerdo al expediente, los hechos del caso, relevantes a los errores señalados, son los siguientes.

La señora Lembo —de origen italoamericano, nacida y criada en New York y quien no habla español, aunque, aparentemente, lo entiende parcialmente—, y el señor Mayendía —de origen cubano y criado en Puerto Rico—, contrajeron matrimonio el 23 de mayo de 1987 en Nueva York. La pareja estableció su domicilio en Puerto Rico.

Durante el matrimonio procrearon un único hijo, Georgie, quien nació en San Juan, el 28 de septiembre de 1990. El menor se crió en Puerto Rico, donde el señor Mayendía tiene un negocio propio dedicado a la

importación y distribución de frutas y vegetales. La madre permaneció en el hogar, como ama de casa, ocupándose del menor y de sus actividades. El niño ha sido educado en una escuela donde la enseñanza se imparte en inglés y se comunica, esencialmente, en dicha lengua, estudiando el español como un segundo idioma. Hasta el divorcio de sus padres —y aún después, en ciertas ocasiones—, el niño solía pasar sus vacaciones de verano y Navidad en Estados Unidos, con los abuelos y tíos maternos, una familia extendida, aparentemente muy unida.

El 30 de junio de 1998, la señora Lembo presentó una demanda de divorcio por la causal de trato cruel y, entre otros remedios, solicitó la custodia de Georgie. El señor Mayendía reconvino por la misma causal y solicitó, él también, la custodia del menor. Así comenzó un proceso que se ha distinguido por un alto grado de animosidad entre las partes, requiriendo, en determinadas ocasiones, amonestaciones de parte del Tribunal de Primera Instancia.

El 26 de agosto de 1998, como parte del trámite del divorcio, el Tribunal de Primera Instancia refirió a las partes al Programa de Relaciones de Familia para que realizaran *un estudio social y recomendaran un plan de relaciones paterno-filiales adecuados para el niño y cuál de los padres debe tener su custodia.* Véase, minuta de esa fecha. A pesar de que el foro apelado había dictado dicha orden, el señor Mayendía presentó, el 18 de noviembre de 1998, una moción en la que indicó que nada había dispuesto dicho tribunal sobre el estudio social y solicitó que se refiriera el caso a la trabajadora social. Informó, además, que él utilizaría sus propios peritos, la Dra. Nydia Lucca, sicóloga, y la Dra. Nuria Sabaté, siquiatra. ■ El 23 de noviembre de 1998, el foro *a quo* ordenó, nuevamente, al Programa de Relaciones de Familia realizar el estudio social y evaluar al menor.

Tras diversos incidentes, el 3 de diciembre de 1998, el Tribunal de Primera Instancia, por voz del Hon. Angel L. Díaz del Valle, dictó sentencia de divorcio. Las partes habían estipulado, entre otros puntos, cambiar la causal a la de abandono, a favor de la señora Lembo, y el señor Mayendía había desistido de la reconvención. El foro apelado adjudicó la custodia provisional del menor a la madre y señaló la vista de custodia permanente para el 3 de marzo de 1999, además de citar a la pareja a comparecer a la Oficina del Programa de Relaciones de Familia, para ser evaluados por la trabajadora social.

El 19 de enero de 1999, la trabajadora social asignada al caso, Sra. Marilidia Castro Cedeño, solicitó una prórroga al Tribunal de Primera Instancia y citó a las partes para la entrevista inicial. El 5 de febrero de 1999, dicha funcionaria presentó una nueva moción en la que indicó el progreso del caso y solicitó ciertas órdenes del foro apelado.

El 23 de abril de 1999, la trabajadora social, señora Castro, presentó ante el Tribunal de Primera Instancia un informe social sobre custodia. En él indicó las gestiones realizadas, durante el período entre enero y abril de 1999: visitas a ambos hogares y a la escuela, entrevistas con el menor, con ambos progenitores y sus respectivos siquiatras, con la doctora Lucca —perito del señor Mayendía—, y con la Dra. Dalila Aguilú, otra siquiatra que había entrevistado a ambas partes y al menor, y con otros colaterales, además de examinar unas pruebas de drogas a las que ambas partes se habían sometido.

La señora Castro señaló en su informe que el menor le indicó que deseaba vivir con su mamá, pero que prefería permanecer en Puerto Rico y continuar asistiendo a su escuela de siempre. La señora Castro señaló, no obstante, que el niño estaba receptivo para el traslado a Estados Unidos.

La señora Castro indicó que, a base de los criterios de *Nudelman v. Ferrer Bolívar,* 107 D.P.R. 495 (1978), recomendaba adjudicar la custodia a la señora Lembo, pero requiriendo que se le proveyera asistencia sicológica al menor que le permitiera prepararse para el traslado a Estados Unidos. En específico, en la parte de asesoramiento al tribunal, la trabajadora social recomendó, entre otros asuntos, lo siguiente:

*"La señora Lembo gestionará un servicio de ayuda profesional para el menor que le permita prepararse para el cambio. El profesional seleccionado rendirá un informe al Tribunal sobre el progreso del niño y su capacidad para adaptarse a un nuevo ambiente, escuela, comunidad, etc. El menor no debe salir de la isla para reubicarse hasta que no se complete este proceso."*

Informe social sobre custodia, de 23 de abril de 1999, a las págs. 23-24. ■

Mientras esto ocurría, la controversia continuó su curso.

El 2 de julio de 1999, la señora Lembo presentó ante el foro *a quo* una moción en la cual indicó, entre otros puntos, que estaba pendiente una solicitud de autorización del tribunal para trasladarse a vivir con Georgie, al condado de Modena, New York, donde residía la familia de ella y donde el menor asistiría a la escuela.

El 14 de julio de 1999, el señor Mayendía presentó ante el Tribunal de Primera Instancia una moción en la que indicó que la señora Lembo no había presentado previamente ninguna petición de autorización para trasladarse fuera de Puerto Rico y que la moción presentada por ella el 2 de julio de 1999 era, en ese sentido, engañosa.

La vista de custodia permanente se celebró, finalmente, el 17 y 18 de agosto de 1999, ante el Hon. Luis A. Rosario Villanueva. El foro apelado adjudicó la custodia permanente a la madre, tras haber desistido el padre de su solicitud. El tribunal *a quo* dejó pendiente, sin embargo, la petición de autorización de la señora Lembo para trasladarse a vivir con el menor a Modena porque, según indicó, no encontraba evidencia en el expediente de dicha petición. Ordenó, en consecuencia, a la madre proveer al tribunal, en el término de tres días, la información sobre el lugar donde viviría Georgie en Estados Unidos y la escuela a la que asistiría. El 20 de agosto de 1999, la señora Lembo presentó la información requerida.

En esa misma vista de 18 de agosto de 1999, el Tribunal de Primera Instancia, Sala de Bayamón, a petición del señor Mayendía y a pesar de la oposición de la madre, ordenó el traslado del caso a la Sala Superior de San Juan, por haberse mudado la señora Lembo al sector del Condado.

El 25 de agosto de 1999, la señora Lembo presentó una moción ante el foro apelado, Sala Superior de Bayamón, en la que (1) solicitó reconsideración de la decisión de traslado a la Sala Superior de San Juan, y (2) informó al Tribunal de Primera Instancia que el señor Mayendía, en efecto, conocía los pormenores del traslado del menor a Modena, por lo menos, desde el 14 de abril de 1999, fecha en que, en una deposición tomada a la señora Lembo, ésta ofreció detalles sobre su intención de mudarse a Estados Unidos. La señora Lembo acompañó dicha moción con la parte de la transcripción correspondiente. ■ De acuerdo a nuestro examen de los autos, el tribunal *a quo*, Sala de Bayamón, no tomó ninguna determinación respecto a dicha moción de reconsideración y el caso fue trasladado a San Juan. ■ La Sala Superior de San Juan, según evidencia el expediente, tampoco tomó ninguna determinación sobre la referida moción de reconsideración.

El 15 de septiembre de 1999, el señor Mayendía informó al Tribunal de Primera Instancia que la madre había sacado al menor fuera de la jurisdicción sin la autorización del tribunal y lo había matriculado en la escuela Plattekill Elementary School, en Modena. Solicitó, entre otros remedios, que se le proveyera la custodia provisional de su hijo.

A continuación ocurrieron diversos incidentes, tanto en la jurisdicción de New York como en la del Estado Libre Asociado de Puerto Rico. El 16 de septiembre de 1999, el Tribunal de Primera Instancia, por voz de la Hon. Yolanda Doitteau Ruiz, ordenó a la madre regresar con el menor a Puerto Rico en o antes del 27 de septiembre de 1999 y mostrar causa de porqué no debía ser encontrada incursa en desacato. El foro apelado determinó, además, que mantenía la jurisdicción sobre el caso y ordenó paralizar cualquier solicitud presentada

por la señora Lembo en New York. ■

El 23 de septiembre de 1999, en una vista sobre el estado de los procedimientos, el foro apelado se reafirmó en su orden previa de 16 de septiembre y ordenó, nuevamente, el regreso del menor a Puerto Rico. Fijó la vista de desacato para el 1 de octubre de 1999 y la vista de autorización para traslado fuera de Puerto Rico, para el 13 de octubre de 1999.

La señora Lembo, inconforme con la determinación del foro apelado con fecha de 16 de septiembre, presentó una petición de *certiorari* ante nos, acompañada de una moción en auxilio de nuestra jurisdicción (caso KLCE-99-01952). El 29 de septiembre de 1999, este Tribunal ■ determinó que la orden del 16 de septiembre de 1999, en la que se ordenó que se regresara al menor a la jurisdicción de Puerto Rico, prevalecía y que, aunque el traslado del caso a San Juan causó dilación en la consideración de la solicitud de autorización para mudarse a Estados Unidos, la señora Lembo debió haber obedecido al Tribunal de Primera Instancia y no abandonar la jurisdicción de Puerto Rico sin autorización. Este Tribunal ordenó, además, al Tribunal de Primera Instancia considerar la solicitud para trasladarse fuera de Puerto Rico.

En una orden de 1 de octubre de 1999, sin que hubieran regresado a Puerto Rico ni el menor ni su madre, el Tribunal de Primera Instancia, por voz de la Hon. Nydia Z. Jiménez, adjudicó la custodia *pendente lite* al señor Mayendía y ordenó el traslado del menor a la jurisdicción de Puerto Rico.

En la vista del 13 de octubre de 1999, ante informes del señor Mayendía de que la señora Lembo había presentado una solicitud de custodia en New York, el Tribunal de Primera Instancia se reiteró en que era el foro con jurisdicción sobre el caso.

El 5 de noviembre de 1999, el tribunal de New York dictó una orden mediante la cual desestimó la solicitud de custodia entablada por la señora Lembo, al igual que las otras acciones instadas por ésta en dicha jurisdicción. Otorgó, además, entera fe y crédito a la determinación del Tribunal de Primera Instancia concediendo la custodia provisional del menor al señor Mayendía. Tras varios incidentes y haber sido encarcelada la señora Lembo en New York al negarse a entregar al niño, éste fue entregado al padre el 23 de noviembre de 1999, regresando ambos a Puerto Rico. Desde esa fecha, el menor ha permanecido bajo la custodia provisional de su padre.

El 6 de diciembre de 1999, la señora Lembo solicitó la custodia permanente del menor.

El 15 de diciembre de 1999, el señor Mayendía solicitó, una vez más, al Tribunal de Primera Instancia que ordenara la intervención de la trabajadora social.

En una vista celebrada el 1 de marzo de 2000, el foro apelado solicitó a ambos padres que propusieran nombres de siquiatras para seleccionar uno que sirviera como perito del tribunal y evaluara los informes y recomendaciones de los profesionales de la salud que habían atendido las partes.

El 10 de abril de 2000, el Tribunal de Primera Instancia, por estipulación de las partes, designó a la doctora Guevara como perito del tribunal.

Mientras tanto, el 31 de marzo de 2000, la señora Lembo había solicitado que se actualizara el estudio social.

El 1 de mayo de 2000, la señora Lembo solicitó, entre otros remedios, que se celebrara urgentemente una vista para fijar las relaciones materno filiales, pues ella y el menor no se habían relacionado, oficialmente, desde diciembre de 1999. ■ Solicitó, también, al foro apelado que, además de utilizar el peritaje de la doctora

Guevara, ordenara la actualización del informe de la trabajadora social elaborado, originalmente, en abril de 1999. El foro *a quo* señaló vista para el 28 de junio de 2000 para considerar ambas peticiones.

El 28 de junio de 2000, el Tribunal de Primera Instancia —a petición de la señora Lembo y a lo que el señor Mayendía señaló no tener objeción— designó a la Procuradora Especial de Relaciones de Familia como defensora judicial del menor y dispuso un calendario para las relaciones materno-filiales, previo depósito de fianza. El Tribunal apelado ordenó, además, al Programa de Relaciones de Familia actualizar el informe social y que se presentara un informe interagencial con la oficina de New York, estado de residencia de la señora Lembo. ▇

El 18 de julio de 2000, la señora Lembo presentó una moción informativa al tribunal apelado en la cual indicó las gestiones realizadas en torno al informe social que debía realizarse en New York, una lista de las agencias disponibles en dicho estado y una explicación sobre la manera en que el mismo debía ser sufragado, y solicitó que el tribunal seleccionara la agencia para que la oficina local pudiera coordinar la realización del estudio. Las partes debían acordar cómo pagar el costo del informe, o el tribunal apelado dispondría quién y cómo costearía el mismo.

No hemos logrado identificar en el expediente ningún documento que explique cómo se seleccionó la agencia. El 28 de septiembre de 2000, no obstante, la trabajadora social del Programa de Relaciones de Familia asignada en esta ocasión al caso, Sra. Socorro López Casas, presentó una moción urgente en la que explicó las gestiones realizadas hasta ese momento e informó haber tramitado y recibido el informe interagencial. Solicitó, además, la autorización del foro apelado para que la Clínica de Diagnóstico de la Rama Judicial evaluara a las partes y al menor.

En una vista celebrada el 19 de octubre de 2000, la trabajadora social, señora López, presentó el *Informe preliminar sobre custodia*, fechado el 9 de octubre de 2000. ▇ En dicho informe, la trabajadora social indicó que no podía hacer una recomendación de custodia permanente porque se requería tener evaluaciones recientes de los dos progenitores en el área de personalidad. Con el documento, la señora López incluyó copia del informe interagencial realizado en New York. Este último, que trataba tanto el aspecto de la solicitud de custodia como el del traslado del menor, recomendaba que se concediera la custodia a la madre y que se le permitiera a ésta mudarse con el menor a Modena.

En esa vista de 19 de octubre de 2000, el Tribunal de Primera Instancia, en respuesta a la solicitud de la trabajadora social, coordinó con dicha funcionaria las evaluaciones que debía realizar la Clínica de Diagnóstico de la Rama Judicial. Las partes debían ser examinadas por los doctores Hugo Román, sicólogo, y Harry Valcárcel, siquiatra, pertenecientes ambos a la Clínica, y dispuso los plazos que tendrían ambos facultativos y la trabajadora social para rendir los informes correspondientes.

El 14 de diciembre de 2000, la trabajadora social, señora López, presentó ante el Tribunal de Primera Instancia su informe final, una *Moción-informe* —, que indicó que complementaba el *Informe preliminar* de 9 de octubre de 2000—, en la que efectuó sus recomendaciones finales sobre la petición de custodia.

El 28 de diciembre de 2000, en una vista de asuntos pendientes, la trabajadora social, señora López, compareció ante el Tribunal de Primera Instancia. El juez ordenó a la doctora Guevara reunirse con la trabajadora social para que trataran de llegar a un acuerdo sobre la recomendación de custodia, pues ambas sostenían posiciones contrarias. Se reunieron en cámara, además de ellas dos, el Dr. Román —el sicólogo de la Clínica, a solicitud de la representante legal de la señora Lembo—, y los abogados de las partes. Estuvo presente, además, la Procuradora Especial de Relaciones de Familia. De acuerdo a la minuta correspondiente, la doctora Guevara y la señora López no lograron ponerse de acuerdo.

En una vista de seguimiento celebrada el 12 de febrero de 2001, el Tribunal de Primera Instancia y la Procuradora Especial de Relaciones de Familia asignada al caso entrevistaron al menor en cámara.

La vista en su fondo para la consideración de la custodia permanente comenzó, propiamente, el 5 de marzo de 2001 y se extendió a través de unas catorce sesiones durante los meses de marzo a junio de 2001, ante el Hon. Manuel A. Santiago Tirado. ■■ Comparecieron la doctora Guevara, como perito del Tribunal apelado y los doctores Hugo Román, sicólogo, y Harry Valcárcel, siquiatra, pertenecientes ambos a la Clínica de Diagnóstico de la Rama Judicial. Estos habían evaluado a la señora Lembo y al señor Mayendía en su capacidad para ejercer el rol materno y paterno, por orden del tribunal apelado y a petición de la trabajadora social. Véanse, págs. 323-324 y 331 del apéndice. Comparecieron, además, como testigos, varias profesoras del menor, el Dr. Alan Austen, director del colegio al que asiste y la dueña del centro de tutorías en el que recibe servicios. También prestaron testimonio la doctora Nydia Lucca Irizarry, sicóloga, como perito del señor Mayendía, y el Dr. José H. Rodríguez, sicólogo, como perito de refutación de la señora Lembo.

Durante la vista, las maestras testificaron sobre la actitud y el desempeño del menor en la escuela. El director, doctor Austen, como testigo del señor Mayendía, habló sobre los procedimientos de la escuela en general y sobre el seguimiento que se les provee a los niños que, como Georgie, están pasando por una situación familiar difícil, ya sea por muerte o divorcio.

En relación con la custodia, los doctores Román y Valcárcel, sicólogo y siquiatra, respectivamente, de la Clínica de Diagnóstico de la Rama Judicial, testificaron que tanto el padre como la madre están capacitados para ejercer la custodia. Indicaron, sin embargo, que no podían hacer una recomendación de custodia porque eso no era lo que se les había solicitado y, por lo tanto, no habían evaluado al menor.

La doctora Lucca, perito del señor Mayendía, indicó que, tras conocer el traslado del menor a New York sin autorización del tribunal, recomendaba que se le concediera la custodia al padre. Anteriormente, la doctora Lucca había presentado un informe, con fecha de 27 de abril de 1999, en el que recomendaba que se mantuviera el *status quo* —el menor estaba en ese momento bajo la custodia de la madre—, y que se les proveyera asistencia sicológica al menor y a los padres.

La doctora Guevara recomendó, tanto en su informe como en su testimonio, que se le proveyera la custodia al padre. Entre las razones, expuso, que, de esa forma, el niño tenía la estructura que el padre podía proporcionarle y, a la vez, tenía a la madre porque ésta no iba a abandonar al menor. ■■ Entiende la doctora Guevara que es preferible que el menor permanezca con el padre, por ser varón y por la etapa de desarrollo en que el niño se encuentra. ■■

La trabajadora social que elaboró el informe final sobre custodia, la señora López, no testificó durante la vista de custodia, pues se había retirado del servicio público el 31 de diciembre de 2000 y no pudo ser localizada, a pesar de repetidas gestiones de parte del foro apelado y de la abogada de la señora Lembo.

El 8 de junio de 2001, el caso quedó sometido. En la vista celebrada ese día, la señora Lembo solicitó que se admitiera el Informe de la Trabajadora Social, al cual estaba unido el informe interagencial. De acuerdo a la minuta de dicha vista y a un escrito presentado por la Procuradora sobre la admisibilidad del informe social, el señor Mayendía se opuso, por haber sido sufragado dicho informe por la señora Lembo y porque él no había tenido, alegadamente, la oportunidad de interrogar a la trabajadora social que lo elaboró. El Tribunal de Primera Instancia concedió a ambas partes hasta el 30 de junio de 2001 para expresarse sobre el particular.

El 22 de junio de 2001, la Procuradora de Menores presentó su escrito sobre la admisibilidad del informe.

El Tribunal de Primera Instancia indica en la sentencia apelada (de 30 de julio de 2001) que, a pesar de que

le concedió hasta el 30 de junio de 2001 a ambos progenitores para expresarse por escrito sobre la admisibilidad del informe social, ninguno de los dos lo hizo. En el expediente ante nos, no obstante, encontramos copia de una moción que la señora Lembo presentó ante el foro apelado, el 5 de julio de 2001, en la que ésta discute la admisibilidad del informe.

En dicho informe —que consta, como hemos dicho, de dos partes, un *Informe preliminar* y una *Moción-Informe*—, la trabajadora social, señora López, efectuó sus recomendaciones finales sobre custodia. Señaló que las evaluaciones sicológicas y siquiátricas realizadas por la Clínica (doctores Román y Valcárcel) indicaban que ambos progenitores están facultados, desde el punto de vista emocional, para desempeñar el rol de padre o madre custodio. En términos de evaluación social, la señora López indicó que existe un conflicto crónico de comunicación en la pareja y que, por otro lado, el menor ha crecido identificado con la tradición cultural de la madre y que la pareja permitió dicha orientación durante la vigencia del matrimonio. Añadió que el menor necesita tratamiento psicoterapéutico para trabajar con su conflicto de lealtades y que el niño debía continuar recibiendo tratamiento, pues el padre interrumpió el mismo sin que el menor hubiera sido dado de alta. Señaló que ambos padres han utilizado al menor para castigarse mutuamente y para forzar a que prevalezcan sus respectivas posiciones. Recomendó que se le concediera la custodia a la madre, pero estableciendo varias condiciones, entre ellas, que las partes y el menor reciban ayuda profesional. No hizo alusión, sin embargo, a la solicitud de traslado fuera de la jurisdicción que la madre había presentado.

El 24 de julio de 2001, la Procuradora Especial de Relaciones de Familia presentó su recomendación sobre custodia al tribunal *a quo*. ■

El 30 de julio de 2001, el foro *a quo* emitió la sentencia apelada. Inconforme, la señora Lembo presentó la apelación que nos ocupa.

## II

El Tribunal Supremo de Puerto Rico ha expresado repetidamente que, en las determinaciones de custodia, el principio cardinal que debe guiar a los tribunales es responder a los mejores intereses y el bienestar del menor. *Maldonado v. Burris*, 154 D.P.R. ___ (2001); **2001 J.T.S. 72**; *Sánchez Cruz v. Torres Figueroa*, 123 D. P.R. 418 (1989); *Nudelman v. Ferrer Bolívar, supra*; *Centeno Alicea v. Ortiz*, 105 D.P.R. 523 (1977); *Marrero Reyes v. García Ramírez*, 105 D.P.R. 90 (1976).

La jurisprudencia desarrollada por el Tribunal Supremo fue incorporada al Código Civil de Puerto Rico. El actual Art. 107 de dicho código, 31 L.P.R.A. sec. 383 (Supl. 2001), dispone, en lo pertinente, lo siguiente:

*"En todos los casos de divorcio, los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el Tribunal, en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos; pero el otro cónyuge tendrá derecho a continuar las relaciones de familia con sus hijos, en la manera y extensión que acuerde el Tribunal al dictar sentencia de divorcio, según los casos."*

Por consiguiente, los tribunales deben guiarse siempre por el bienestar y los mejores intereses de dicho menor, tomando en consideración, entre otros criterios: la preferencia del menor; su sexo, edad, y salud mental y física; el cariño que puede brindarle cada parte en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes. *Sánchez Cruz v. Torres Figueroa, supra*; *Nudelman v. Ferrer Bolívar, supra*; *Marrero Reyes v. García Ramírez, supra*. Cada situación debe evaluarse cuidadosamente, atendiendo las circunstancias particulares de cada caso.

Como indicó recientemente el Tribunal Supremo, citando a *Marrero Reyes v. García Ramírez, supra*:

*"Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en un asunto de tan extrema dificultad."*

*Maldonado v. Burris, supra*. (Enfasis suplido.)

En cuanto a la preferencia del menor, el Tribunal Supremo ha indicado que los jueces no están obligados, en todos los casos, a entrevistar personalmente al menor, y que pueden basar su determinación sobre la preferencia del menor a lo expresado por éste a los padres u otros funcionarios o profesionales que lo entrevisten. Es importante, no obstante, conocer con certeza cuál es la determinación del niño o niña sobre con cuál de los progenitores desea vivir y evaluar dicha determinación con los demás criterios esbozados. Si el Tribunal estimase que hay duda sobre este factor, deberá entonces tomar las medidas pertinentes para lograr conocer el verdadero sentir del niño. *Nudelman v. Ferrer Bolívar, supra*.

De otro lado, si al analizar la totalidad de los criterios antes mencionados, se encuentra que el menor es atendido adecuadamente por la madre o el padre que tiene la custodia, por razones del bienestar del menor, entonces no se le concederá la custodia al que promueve el cambio de custodia, aun cuando éste se encuentre en igualdad de condiciones. *Nudelman v. Ferrer Bolívar, supra; Ortiz v. Vega*, 107 D.P.R. 831 (1978). En ese sentido, una vez emitido un decreto judicial concediendo la custodia de un menor a uno de sus padres, dicha decisión crea un estado de derecho que —*salvo circunstancias extraordinarias*—, no debe ser alterado *sumariamente* y una vez se pondere *sosegadamente* la posición de ambas partes. *Santana Medrano v. Acevedo Osorio*, 116 D.P.R. 298 (1985).

De otro lado, el Tribunal Supremo ha indicado que, antes de emitir una decisión respecto a cuestiones de custodia o patria potestad, los tribunales pueden ordenar la comparecencia de las personas que entienda que pueden ayudarlo a tomar la determinación, además de requerir aquellas investigaciones sociales e informes que entienda *procedentes y convenientes. Santana Medrano v. Acevedo Osorio, supra; Nudelman v. Ferrer Bolívar, supra*. También ha indicado el Tribunal Supremo que, cuando un informe de una agencia social es utilizado en una determinación de custodia, el Tribunal de Primera Instancia está en la obligación de permitir a las partes examinar dicho informe y objetar al mismo o presentar prueba en contrario, si lo desean. *Colón v. Meléndez*, 87 D.P.R. 442 (1963).

Como ha indicado el Tribunal Supremo, el Tribunal de Primera Instancia está facultado para ordenar aquellas investigaciones que considere oportunas, a fin de recopilar *toda la información* posible. *Castro v. Meléndez*, 82 D.P.R. 573, 578, n. 4 (1961). Aunque se admita un informe social, sin embargo, el tribunal puede darle el peso que considere correcto y no está obligado por el mismo.

De otro lado, si una parte ha consentido a que se utilice un informe de una agencia de bienestar, entonces no puede alegar en apelación que se le violó el debido proceso de ley. *Id*.

En el caso de autos, el Tribunal de Primera Instancia ordenó tanto la intervención inicial del Programa de Relaciones de Familia y la preparación de los dos informes sociales que se efectuaron, así como la actualización del segundo. Las dos trabajadoras sociales a cargo mantuvieron informado al tribunal apelado en todo momento sobre las gestiones realizadas y requirieron la intervención de dicho foro cuando lo consideraron necesario. A su vez, las partes fueron conscientes del progreso del informe social durante todo el proceso y, de hecho, en diversas ocasiones, tanto la señora Lembo como el señor Mayendía solicitaron al foro *a quo* alguna intervención al respecto, requiriendo que se realizara o completara el informe social. El primer informe social fue presentado el 23 de abril de 1999. El segundo informe fue presentado, de forma preliminar, el 19 de octubre de 2000 y fue actualizado, luego de haberse realizado nuevas evaluaciones siquiátricas y sicológicas a ambos progenitores,

mediante una moción de 14 de diciembre de 2000. La objeción del señor Mayendía a la utilización del informe de la trabajadora social, radica, en que ésta no estuvo disponible para ser interrogada durante la vista y en que el informe interagencial fue sufragado por la señora Lembo.

Como argumentó la Procuradora de Menores en su escrito sobre la admisibilidad del informe, el mismo era admisible porque, en primer lugar, el tribunal *a quo* lo había ordenado, además de que las partes habían tenido amplia oportunidad de examinarlo y, de haberlo deseado, traer prueba en contrario. Véanse, págs. 472-475 del apéndice de la apelación.

Tratándose de un informe oficial, el que la trabajadora social, Sra. Socorro López, no estuviera disponible y no pudiera comparecer ante el tribunal *a quo*, no era un impedimento mayor para que el informe elaborado por ésta fuera considerado por dicho foro. Regla 65(H) de Evidencia, 32 L.P.R.A. Ap. IV, R. 65(H).

En el caso de autos, el Tribunal de Primera Instancia tenía la obligación de considerar la opinión de todos los peritos presentados, en particular, los propios peritos del tribunal. *Maldonado v. Burris, supra*. El que la trabajadora social no sea ni sicóloga ni siquiatra no la hace, en ese sentido, menos *perito* que esos otros profesionales, pues su informe se preparó, en primer lugar, por petición del propio tribunal, que como vimos está facultado para requerir todos aquellos informes que considere pertinentes. En segundo lugar, dicha profesional está particularmente adiestrada para analizar un caso en todas sus partes y efectuar sus recomendaciones a la luz, precisamente, de ese *cuadro general* al que alude el tribunal apelado.

Por otro lado, las partes —y en particular, el señor Mayendía, que es quien objeta su utilización—, habían tenido amplia oportunidad, desde el 14 de diciembre de 2000, de presentar prueba en contrario o expresarse sobre el particular. Como es sabido, las Reglas 61, 64(A)(5) y 64(B)(5) de Evidencia, 32 L.P.R.A. Ap. IV, permiten la admisión de prueba de referencia cuando el testigo no está disponible, se han hecho todas las gestiones para localizarlo se le informó a la persona que objeta la admisión, la intención de que se utilizara dicho documento como evidencia, además del nombre y la dirección del declarante, y la declaración posee suficiente indicios de confiabilidad.

En este sentido, ha indicado el Tribunal Supremo, la transcripción del testimonio o el modo utilizado para reproducirlo —en este caso, el informe—, deben ofrecer suficientes signos de confiabilidad que brinden al juzgador de los hechos una base satisfactoria para evaluar la veracidad de la declaración anterior y debe demostrarse la condición de no disponibilidad del testigo, a pesar de los esfuerzos de buena fe de quien se propone presentarlo para conseguir su presencia en el juicio. *Pueblo v. Ruiz Lebrón,* 111 D.P.R. 435 (1981). La determinación de indisponibilidad está sujeta a demostrar que el proponente ha efectuado un esfuerzo razonable para lograr la presencia del testigo en el juicio. *Nieves López v. Rexach Bonet,* 124 D.P.R. 427 (1989).

En el caso de autos, como indicamos, los documentos cuestionados eran los dos informes presentados ante el foro apelado, el *Informe preliminar sobre custodia*, de 9 de octubre de 2000 y la actualización del mismo, la *Moción-informe* de 14 de diciembre de 2000, documentos ambos que satisfacen el requisito de confiabilidad de la Regla de Evidencia 65 (B)(5), *supra*, y *Pueblo v. Ruiz Lebrón, supra*. De otro lado, se hicieron numerosas gestiones, según se evidencia en el expediente e, incluso, en la transcripción de la vista presentada ante nos, para localizar a la señora López y que ésta compareciera a declarar, cumpliéndose así, en ese sentido, el segundo requisito de *Pueblo v. Ruiz Lebrón, supra*.

De otro lado, la trabajadora social, Sra. Socorro López, estuvo presente, como dijimos, en una vista celebrada el 28 de diciembre de 2000, y se reunió en cámara, con la doctora Guevara, a petición del juez, para discutir, precisamente, las recomendaciones de custodia de ambas. En esa ocasión estuvieron presentes, según la minuta correspondiente, además del Dr. Román y la Procuradora Especial de Relaciones de Familia, los abogados de las partes.

En cuanto al argumento de que el estudio interagencial fue costeado por la señora Lembo, es necesario hacer un recuento de lo que se percibe a través del expediente sobre este aspecto de la controversia. Como indicamos anteriormente, el tribunal apelado había ordenado en junio de 2000 a las trabajadoras sociales preparar el informe interagencial, y al señor Mayendía y a la señora Lembo hacer las gestiones correspondientes para ello. Como dijimos anteriormente, el 18 de julio de 2000, la señora Lembo indicó al tribunal apelado, entre otros aspectos relacionados con el informe social interagencial, la manera en que el mismo debía ser sufragado. No se evidencia en el expediente ante nos, como dijimos anteriormente, qué ocurrió posteriormente ni porqué la señora Lembo sufragó el mismo, si es que lo hizo.

Como es sabido, es norma reiterada de nuestro ordenamiento que las determinaciones de hechos de los foros de primera instancia deben ser objeto de gran deferencia, en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Belk v. Martínez*, 146 D.P.R. 215 (1998). Asimismo, en aquellos casos en los cuales el juzgador haga determinaciones al amparo del poder discrecional que le confiere un estatuto o regla, éstas deberán ser respetadas por los foros apelativos, a menos que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la aplicación de una norma procesal o sustantiva, y que la intervención en esta etapa evitará un perjuicio sustancial a una de las partes, o la necesidad de un cambio de política pública procesal o sustantiva. Cf. *Lluch v. España Service Sta.*, 117 D.P.R. 729 (1986); *Ex parte Valencia*, 116 D.P.R. 909 (1986).

Dicha deferencia —ya sea en la percepción de la prueba o en el ejercicio de su discreción—, se fundamenta en el hecho de que los jueces del Tribunal de Primera Instancia están en mejor posición que los foros apelativos para aquilatar la evidencia que desfila en los procedimientos ante sí. *Pueblo v. Collado Justiniano*, 140 D.P.R. 107 (1996) (sentencia); *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981). Los tribunales apelativos no deben sustituir el criterio del juzgador, quien tuvo la oportunidad de ver declarar los testigos y apreciar su *demeanor*. *Pérez Cruz v. Hosp. La Concepción*,115 D.P.R.721 (1984); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

La Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, en lo pertinente, dispone:

*"... las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos...".*

De otra parte, en relación con el testimonio pericial, es sabido que el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. *Figueroa v. Del Rosario*, 147 D.P.R. ____ (1998), **98 J.T.S. 151**; *Pueblo v. Montes Vega*, 118 D.P.R. 164 (1986).

En cuanto a los informes y documentos presentados por el perito, un foro apelativo no está obligado "*a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo ... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba pericial y hasta descartar la misma, aunque resulte ser técnicamente correcta*". *Pueblo v. Soto González*, 149 D.P.R. ____ (1999); **99 J.T.S. 117**, y *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935 (1997).

El Tribunal de Primera Instancia basó su determinación, esencialmente, en la recomendación de la doctora Guevara, siquiatra que ambas partes habían seleccionado para que sirviera como perito del tribunal y evaluara los informes y recomendaciones de los profesionales de la salud que habían atendido las partes. La doctora Guevara, no obstante, basó su recomendación en ciertos criterios que no cumplen con la totalidad de los factores esbozados en *Nudelman v. Ferrer Bolívar, supra*.

En el caso de autos, no existe una opinión uniforme de parte de los peritos. En *Maldonado v. Burris, supra*,

,según indica el Tribunal Supremo, todos los peritos e informes al tribunal coincidían en que, para la menor en cuestión, era preferible que se concediera la custodia al padre. En el caso de autos, la opinión de los peritos e informes no es unánime. Al igual que en dicho caso, no obstante, el Tribunal de Primera Instancia, en la apelación que nos ocupa, erró al no tomar en cuenta la opinión de *todos* los peritos.

De otro lado, por diversas razones, también erró el Tribunal de Primera Instancia al no tomar en cuenta el Informe de Trabajo Social y el estudio interagencial anejo. En primer lugar, porque el estudio en cuestión se realizó, en efecto, por orden de dicho foro, y bajo el seguimiento de éste. Como vimos en la relación de los hechos procesales del caso, el foro *a quo* ordenó, repetidamente, la intervención del Programa. De otro lado, la trabajadora social mantuvo al tribunal apelado al tanto de las gestiones realizadas, y solicitó las órdenes que consideró pertinentes, accediendo dicho foro a todas las solicitudes que planteó dicha funcionaria —evaluación de las partes para drogas, evaluaciones sicológica y siquiátrica de las partes por los peritos de dicha agencia, los doctores Román y Valcárcel. De otro lado, el señor Mayendía, en diversas ocasiones, como vimos, solicitó la intervención de dicha oficina. Además, las partes —en específico, el señor Mayendía—, tuvieron conocimiento de los informes presentados y la recomendación que contenían. Tuvieron la oportunidad, por lo tanto, de presentar prueba en contrario. Si bien es cierto que la trabajadora social no estuvo presente durante la vista y que, en ese sentido, el señor Mayendía no tuvo la oportunidad de interrogarla, tampoco la tuvo la señora Lembo. Más aún, cuando la comparecencia de los doctores Román y Valcárcel, se origina, precisamente, en el requerimiento de la trabajadora social, pues fue ésta quien recomendó al foro *a quo* que la Clínica de Diagnóstico realizara evaluaciones siquiátricas y sicológicas de las partes.

Por último, también erró el Tribunal de Primera Instancia al ni siquiera mencionar en su resolución la recomendación de la Procuradora Especial de Relaciones de Familia en esta controversia. En la literatura especializada sobre este tema, se recomienda la designación de un defensor judicial para los menores precisamente en los procedimientos de divorcio y custodia en que existe demasiada animosidad entre las partes, pues la naturaleza adversativa del proceso y la situación emocional de éstas les impide frecuentemente pensar en los mejores intereses de los menores afectados. Véanse, John David Meyer, *The "Best Interest of the Child" Requires Independent Representation of Children in Divorce Proceedings*, 36 Brandeis J. Of Fam. Law 445 (1997); Tari Eitzen, *A Child's Right to Independent Legal Representation in a Custody Dispute*, 19 Fam. L.Q.53 (1985).

En el caso de autos, el foro apelado designó, el 28 de junio de 2000, como dijimos, a solicitud de la señora Lembo, a la Procuradora Especial de Relaciones de Familia, como defensora judicial y abogada del menor. A partir de esa designación, hubo representación de la defensora del menor durante todo el proceso, participando activamente en la vista de custodia y en los distintos incidentes del caso. Representantes de la Oficina de la Procuradora tuvieron la oportunidad, además, de entrevistarse con el menor, en repetidas ocasiones, y captar su sentir. La Procuradora sometió diversos escritos ante el Tribunal apelado, uno en el que expuso su opinión sobre la persona a quien debía ser adjudicada la custodia y otro sobre la admisibilidad del informe social.

En relación con la custodia, la Procuradora recomendó al foro apelado que ésta se concediera a la señora Lembo. Expuso que se había reunido tres veces con el menor y que éste había indicado, en las tres ocasiones, que prefería estar con la madre. La Procuradora analizó la recomendación de la doctora Guevara —en la que ésta favorece al padre—, y señaló que dicha profesional utilizó criterios que no se ajustan a los desarrollados por el Tribunal Supremo en *Nudelman, supra*, sino que ella se basó, esencialmente, en la edad y sexo del menor, pues, alegadamente, el niño necesita a su padre por el control que este último ejerce en términos de disciplina y para que el niño desarrolle su identificación sexual. La Procuradora entiende que ese tipo de criterio es cuestionable y que no debe adjudicarse un caso de custodia a base del criterio del sexo del menor.

El Tribunal de Primera Instancia, sin embargo, no alude, en ningún momento de la sentencia, a las recomendaciones de la Procuradora, ni en cuanto a la custodia del menor ni en cuanto a la admisibilidad del

informe de la Trabajadora Social. El foro *a* quo únicamente menciona el hecho de que la señora Lembo solicitó la designación de la Procuradora como defensora judicial del menor y de que el Tribunal accedió a ello.

Como ha indicado el Tribunal Supremo en *Depto. de la Familia v. Soto*, 147 D.P.R. ___ (1999), **99 J.T.S. 21**:

> *"...las determinaciones judiciales referentes a cosas tales como la custodia, la patria potestad o la adopción de menores no son siempre fáciles de hacer. Según hemos señalado reiteradamente, tales determinaciones requieren la cuidadosa ponderación de numerosos factores delicados y sutiles. Nudelman v. Ferrer Bolívar, 107 D.P.R. 495 (1978); Marrero Reyes v. García Ramírez, supra. Con gran frecuencia requieren, además, poner elementos conflictivos en fino balance: reclamos encontrados de los padres, o de éstos frente al Estado, o de unos y otros frente a terceros que también tienen intereses legítimos en el asunto. Las difíciles decisiones judiciales muchas veces tienen que tomarse de cara a las opiniones antagónicas de los peritos y testigos de partes contrarias. Se trata, como hemos reconocido antes, de un 'asunto de tan extrema dificultad'. Marrero Reyes v. García Ramírez, supra, a la pág. 106.*
>
> *El logro de la solución más justa en el angustioso proceso aludido exige contar con el mayor caudal informativo disponible. En lo posible, deben traerse a colación todos los datos, prueba y puntos de vista que sean pertinentes. Sólo así se pueden evaluar y sopesar adecuadamente los diversos y complejos factores que nuestra jurisprudencia ordena que deben analizarse en estos asuntos."*

*Depto. de la Familia v. Soto, supra*. (Enfasis suplido.)

Si bien es cierto que los tribunales de Primera Instancia pueden adoptar su propio criterio, aun cuando la prueba pericial resulte técnicamente correcta, *Maldonado v. Burris, supra*; *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 D.P.R. ___ (2000), **2000 J.T.S. 67**, en el caso de autos, ciertas declaraciones del tribunal apelado evidencian, además de los errores que hemos señalado, indicios de percepciones estereotipadas por razón de sexo y de origen étnico. El tribunal apelado menciona *la identificación femenina de Georgie*, refiriéndose al testimonio de la doctora Guevara. ▆

Se percibe, además, cierto juicio equivocado sobre la situación personal de la señora Lembo que, obviamente, fue inducido por la declaración de la doctora Guevara, que el foro apelado adopta por referencia:

> *"...Hay mamás que trabajan y crían sus hijos sin papá, pero están trabajando, tienen una estructura. En este caso en particular, pues la señora Lembo, nunca trabajaba, siempre está atenta de su familia, sus trabajos han sido con su familia."*

Transcripción de la vista del 5 de marzo de 2001, a la pág. 48.

En el caso de autos, todos los peritos y los recursos que comparecieron ante el foro apelado, con la excepción de las doctoras Guevara y Lucca, coincidieron en que era preferible que la custodia de Georgie fuera adjudicada a la señora Lembo. Incluso la doctora Guevara recomienda que la custodia del menor sea adjudicada al padre, como una especie de subterfugio para que conserve a ambos padres cerca, obligando así, indirectamente, a la señora Lembo a permanecer en Puerto Rico. Esto es insostenible.

La vaguedad del estándar que constituye *el mejor interés del menor* ha sido objeto de varios artículos de revistas jurídicas. Véanse, *i.e.*, Tari Eitzen, *A Child's Right to Independent Legal Representation in a Custody Dispute*, *supra*, a la pág. 55.

En el caso de autos, el tribunal apelado se inclina a favor del padre, presumiendo, podemos inferir, que la

madre se adaptará y modificará su intención de mudarse cerca de su familia. Es una forma de discriminar contra la mujer. El foro apelado no analiza la posibilidad de que sea el padre quien se desplace a residir fuera de Puerto Rico para estar más cerca del niño. Sería, obviamente, absurdo, cuando el padre tiene su vida hecha aquí y su negocio también. Pero se pretende, de otro lado, que la madre, en lugar de residir cerca de su familia, en el lugar donde tendría apoyo, recursos y una posibilidad más fácil de ganarse la vida, que sacrifique todo ello *en pos del bienestar del menor*... El argumento, repetidamente esbozado por la doctora Guevara, de que *una madre nunca abandona a su hijo* constituye, si dejamos que prevalezca el criterio del Tribunal de Primera Instancia, una especie de yugo adicional sobre las mujeres de este país, que tendrían entonces -ellas- que adaptar su estilo de vida para someterse a la voluntad del ex cónyuge.

El señor Mayendía argumenta que el testimonio de la doctora Guevara quedó incontrovertido porque la señora Lembo no presentó alegadamente ningún testigo de refutación. Alega que la señora Lembo tenía que traer al pleito *un perito siquiatra en su descargo y presentación de prueba*. Alega el señor Mayendía que la intención de la señora Lembo de traer como testigo de refutación al doctor Rodríguez era improcedente, pues éste era sicólogo, mientras la doctora Guevara es siquiatra. Según el señor Mayendía, los testimonios de la doctora Guevara ni el de la doctora Lucca quedaron incontrovertidos ante el foro apelado, pues la señora Lembo no presentó ningún siquiatra como perito.

Esta visión un tanto mecanicista del derecho probatorio, en especial en lo relacionado con las determinaciones de custodia de menores, nos parece totalmente inadecuada. Como es sabido, al adjudicar los casos de custodia, los tribunales tienen la obligación de proveer a las partes el debido proceso de ley. No obstante, un caso de custodia no constituye un proceso criminal, en los que la adherencia a las Reglas de Evidencia, *supra*, cobra una mayor significación.

Por otro lado, el Tribunal de Primera Instancia tampoco debe penalizar adicionalmente a la señora Lembo por no haber acatado las órdenes del tribunal local ni del de New York cuando rehusó regresar a esta jurisdicción y entregar al menor. El período durante el cual la señora Lembo estuvo encarcelada constituye castigo suficiente para la falta cometida. Su conducta pasada, aunque incorrecta e imprudente, no la incapacita, sin embargo, para ejercer su rol de madre.

En conclusión, en el caso de autos, el tribunal apelado debió haber considerado las opiniones de todos los peritos, al igual que todos los informes incluidos en el expediente. En particular, debió haber considerado el informe social, ordenado por el mismo tribunal y realizado por personal con amplia experiencia y adiestramiento en este tipo de casos. Del mismo modo, debió haber analizado las recomendaciones de la Procuradora, defensora judicial del menor y abogada de éste, y cuyo único objetivo es, precisamente, defender los mejores intereses del niño.

De otro lado, analizando la situación de autos a base de los criterios de *Nudelman, supra*, encontramos que la señora Lembo debe retener la custodia permanente de Georgie. Entre esos factores podemos considerar la preferencia expresada repetidamente por el menor; su sexo, edad, y salud mental y física; el cariño que le brinda incondicionalmente la madre; la capacidad de la madre para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor tanto al hogar, la escuela y la comunidad en que vive en Puerto Rico como su experiencia, evidentemente positiva de acuerdo a los informes de trabajo social en New York, al trasladarse a dicho estado con la familia materna; la interrelación del menor con dicha familia materna; y la salud psíquica de todas las partes.

Como dijimos anteriormente, si al analizar la totalidad de los criterios de *Nudelman, supra*, se encuentra que el menor es atendido adecuadamente por quien tiene la custodia, por razones del bienestar del menor, no se le concederá la custodia al que promueve el cambio de custodia. *Nudelman v. Ferrer Bolívar, supra*. En el caso de autos, la custodia permanente había sido adjudicada previamente a la madre, el 18 de agosto de 1999. Todos

los informes señalan que la madre está capacitada para ejercer la custodia. Todos reconocen, igualmente, el apego del menor por la madre y la preferencia expresada por éste, así como su identificación social y sicológica con la familia materna.

Sabemos de la dificultad de adjudicar situaciones como la de autos y la dificultad con la que se enfrentó el Juez del Tribunal de Primera Instancia al asignársele un caso con un largo historial procesal, frecuentes traslados de sala y más de seis jueces distintos. Somos conscientes del carácter un poco salomónico de la determinación del Tribunal de Primera Instancia y del hecho de que, durante los últimos dos años y medio, desde diciembre de 1999, el menor ha permanecido bajo la custodia del señor Mayendía. En estos momentos, Georgie está próximo a cumplir los doce años y está entrando en el período de la adolescencia, en el que, como indicó la doctora Guevara en su informe, será él quien seleccione con cuál de los padres quiere vivir.

### III

Por los fundamentos antes expresados, revocamos la resolución del Tribunal de Primera Instancia y concedemos la custodia de Georgie a su madre, la señora Lembo. En cuanto a la petición de autorización para mudarse a New York, el Tribunal de Primera Instancia celebrará una vista, para la consideración de dicha petición, dentro del término de 45 días a partir de la notificación del mandato de esta sentencia.

Es importante, como han recomendado los distintos profesionales que han intervenido en el caso, que tanto la señora Lembo, como el señor Mayendía y Georgie continúen recibiendo ayuda terapéutica que les permita adaptarse a los cambios.

Lo acordó y manda el Tribunal y lo certifica la Señora Secretaria del Tribunal de Circuito de Apelaciones.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal de Circuito de Apelaciones

### ESCOLIOS 2002 DTA 98

**1.** Sentencia apelada, a la pág. 13.

**2.** La doctora Sabaté pasó a ser, en realidad, la terapista del menor, por lo que, posteriormente, ella informó al tribunal *a quo* y a las partes que no podía actuar como perito del tribunal ni de ninguna de las partes, por los deberes de confidencialidad que tenía para con el niño.

**3.** En el expediente del tribunal apelado, dicho informe está incluido con los documentos identificados como confidenciales.

**4.** De hecho, un examen del expediente del caso en el foro apelado evidencia que había múltiples referencias al deseo de la señora Lembo de mudarse a New York. El 25 de noviembre de 1998, la señora Lembo presentó una moción en la que indicó que el señor Mayendía tenía pleno conocimiento del interés de la señora Lembo en obtener la custodia del menor y mudarse a New York. De otro lado, en una moción presentada al Tribunal de Primera Instancia, el 2 de febrero de 1999, la señora Lembo hizo alusión a que, desde la celebración de la vista de divorcio en diciembre de 1998, se escogieron las fechas para las vistas de custodia y alimentos, teniendo en cuenta que la madre había expresado que deseaba regresar a Estados Unidos una vez finalizara ese año escolar. Es preciso señalar, además, que, en el acta levantada por el foro *a quo* el 16 de septiembre de 1999, éste hace constar que revisó el expediente y corroboró que en los informes de los peritos considerados en la vista celebrada el 18 de agosto de 1999 para adjudicar la custodia permanente, existían recomendaciones sobre la solicitud de la señora Lembo de trasladarse a vivir a New York.

**5.** Después de diversos incidentes, el 30 de diciembre de 1999, el caso fue trasladado, nuevamente, a la Sala Superior de Bayamón.

**6.** El 8 de septiembre de 1999, la señora Lembo obtuvo de los tribunales de New York (Family Court, Condado de Ulster) una orden de protección provisional contra el señor Mayendía. El 4 de octubre de 1999, la señora Lembo presentó, además, una petición de custodia.

**7.** Mediante el panel compuesto por su presidenta, la Juez Alfonso de Cumpiano, y los jueces Aponte Jiménez y Arbona Lago.

**8.** De acuerdo a una moción presentada por la señora Lembo el 29 de febrero de 2000, durante este período, en la escuela del menor le permitían a ella compartir con su hijo durante la hora del almuerzo.

**9.** Se designa como informe interagencial el informe social preparado, a solicitud del tribunal local, por una agencia de otra jurisdicción, en donde reside una de las partes interesadas en la custodia.

**10.** Dicho informe, al igual que el del 23 de abril de 1999, también está incluido con los documentos identificados como confidenciales. No tiene ninguna indicación ni constituye un *exhibit*. En el informe sometido por la doctora Guevara al foro apelado, ésta indica haber examinado dicho informe.

**11.** El Juez Santiago Tirado advino en contacto con el caso de autos, por primera vez, el 12 de febrero de 2001, fecha en que suspendió la vista señalada por desconocer los pormenores de la controversia, citando a las partes para el 5 de marzo de 2001, para la vista en su fondo. El Juez Santiago Tirado, no obstante, pudo estar presente en todas las vistas sobre custodia, con excepción del 9 de mayo de 2001, y fue quien emitió la sentencia apelada.

**12.** La doctora Guevara indicó, específicamente, que cuando entrevistó a la señora Lembo, ésta informó que estaba dispuesta a hacer arreglos para quedarse a vivir en Puerto Rico para estar cerca del menor. Véase, la transcripción de la vista del 5 de marzo de 2001, a la pág. 47, y la pág. 5 del informe de la doctora.

**13.** Véase, la transcripción de la vista del 5 de marzo de 2001, a la pág. 46.

**14.** En el apéndice del escrito de apelación consta copia de dicho escrito, ponchado como recibido el 24 de julio de 2001 — sin indicar el lugar—, y con otra indicación de *recibido*, con fecha de 31 de julio de 2001, que presumimos se refiere a la oficina de los abogados de la señora Lembo. En el expediente del Tribunal de Primera Instancia, sin embargo, no está incluido dicho escrito. Tampoco aparece en la lista de documentos incluidos que prepara la Secretaría del Tribunal de Primera Instancia al elevar los autos.

**15.** Somos conscientes, no obstante, de la preocupación del Tribunal de Primera Instancia por lograr una solución justa y adecuada en este tipo de casos.